OPINION OF THE COURT
Barbara G. Zambelli, J.
Defendant has been indicted for the crimes of murder in the first degree, murder in the second degree, three counts of attempted murder in the first degree, three counts of attempted murder in the second degree, four counts of assault in the first degree, two counts of reckless endangerment, robbery in the first degree, criminal possession of a weapon in the second degree and two counts of criminal possession of a weapon in the third degree in connection with the July 3, 2005 shooting and robbery at the Cibao Deli in Greenburgh which resulted in the death of Angel Noelio Cabrera and the injury of Jose and Pedro Pena.
Defendant seeks to elicit expert testimony at trial regarding certain psychological phenomena that affect the reliability of identification testimony. By letters to the court dated June 11 and 13, 2007, defendant made an offer of proof regarding this proposed expert testimony. In his June 11 letter, defendant proffered Steven D. Penrod, Ph.D., J.D., as an expert capable of assisting the jury in evaluating the reliability of eyewitness identifications in six areas. Specifically, these areas are (1) that high levels of stress negatively affect identification accuracy and eyewitness recall; (2) that increased exposure time[1] of a witness to the perpetrator at the time of the crime is associated with improved performance in making a correct identification; (3) that a partial disguise worn by a perpetrator diminishes recognition of the perpetrator by the witness; (4) that the retention interval[2] is an important determinant of correct identifications; (5) that there is a low correlation between the confidence of a *931 witness and the correctness of a witness’ identification; and (6) that there is a cross-race bias which impairs the ability of witnesses of one race to make correct identifications of perpetrators of a different race. Additionally, at the Frye hearing, defendant proffered testimony regarding the psychological phenomena of mug shot induced bias[3] and weapon focus,[4] based upon the factual recitations contained in his June 13 letter.
In that letter, defendant argued that such psychological expert testimony is necessary here because this case involves little or no corroborative evidence and because all of the identification witnesses were shown photo arrays containing defendant’s photograph prior to the lineup. Specifically, defendant noted that he was identified by four individuals — Jose Pena, Pedro Pena, Nelson Pena and Phillip Shands. As to Jose Pena, defendant notes that this witness saw a gun before he was shot and saw the perpetrator with cornrows wearing a gray “hoodie” before he ran from the store. The defendant submits that this was an extremely stressful experience, and notes that the witness failed to identify the defendant with cornrows from a photo array two days later. Jose Pena did identify the defendant (with a shaved head) from a photo array on August 25, 2006 and identified him from a lineup on October 16, 2006. As to Pedro Pena, defendant notes that this witness saw the shooter taking money from the cash register, and then saw the shooter point the gun at him and shoot him before he turned and ran. When shown a photo array two days later with defendant’s picture, Pedro was unable to make an identification but indicated that the defendant’s photo appeared to be the person he had seen, but that he was uncertain. Defendant notes that Pedro Pena identified him as the shooter 15 months later at the October 16, 2006 lineup. Defendant alleges that Pedro Pena later said that he did not get a good look at the shooter’s face. As to Nelson Pena, the defendant notes that this witness was outside the store when the shooter walked out after shooting Jose, Pedro and the deceased. Nelson saw the shooter aim at his head and *932 fire a shot, at which point Nelson hit the pavement to avoid being shot. Defendant alleges that Nelson Pena did not identify defendant’s photo and did not identify the defendant as the shooter until the lineup of October 16, 2006. As to Phillip Shands, who was an eyewitness to the crime, defendant notes that the witness stated that he viewed the shooter from 50 feet away and alleges that the shooter had his back to him. Defendant notes that while Shands claimed to recognize the shooter and learned his name a few weeks after the shooting, Shands did not give this information to the police when he called them to report the shooting, nor when he gave a sworn statement a week later. Defendant notes that Shands first identified the defendant from one photo array on September 22, 2005, but that he failed to identify defendant from a different array. Shands also identified the defendant at the October 16, 2006 lineup. In addition to these four witnesses, the defendant notes that a fifth individual, Juan Guzman, who was present in the store during the shootings, allegedly saw the perpetrator taking money from the register and was not shot at by the perpetrator, and never made any identification of the defendant, despite being shown photo arrays. Thus, defendant submits that because of the lack of corroborative evidence, coupled with the circumstances surrounding the witnesses’ respective viewing of the perpetrator and their subsequent identifications (and nonidentifications) of the defendant as the perpetrator, expert testimony regarding phenomena affecting eyewitness identification is relevant and appropriate in this case.
Pursuant to defendant’s offer of proof, on June 14 and June 28, 2007, this court held a Frye hearing regarding defendant’s proposed expert witness testimony.; Both parties also submitted posthearing memoranda in support of their respective positions. At the hearing, the defendant called Dr. Steven Penrod, Distinguished Professor of Psychology at John Jay College of Criminal Justice, and, at the continuation of the hearing on June 28, submitted as exhibits Dr. Penrod’s curriculum vitae, as well as a survey conducted by Dr. Penrod and Tarika Daftary entitled General Acceptance among Experts of Eyewitness Research Findings: A June 2007 Update (hereinafter Penrod survey). The People did not call their own witness at the hearing; however, they offered into evidence as an exhibit a survey by Dr. Saul Kassin, V. Anne Tubb, Harmon M. Hosch and Amina Memon entitled, On the “General Acceptance” of Eyewitness Testimony Research — A New Survey of the Experts, which was *933 published in 56 American Psychologist 405-416 (May 2001) (hereinafter Kassin survey).
Dr. Penrod testified at the Frye hearing that the above psychological phenomena have been generally accepted as reliable by the scientific community of psychologists who conduct research in the field of eyewitness identification. In support of his conclusions, Dr. Penrod referred to several research studies and “meta-analysis,” which is “a statistical method utilized to synthesize . . . large numbers of separate but related studies to determine if there is a general effect that can reliably be ascertained.” (People v Williams, supra at 574.) However, aside from the Penrod survey, none of these studies were introduced into evidence by the defendant. Defendant submits that Dr. Penrod’s testimony, including his references to research studies undertaken in the field, as well as the Penrod survey, establish that the above phenomena have been accepted as generally reliable in the relevant scientific community.
The People oppose the admissibility of testimony by Dr. Pen-rod regarding only certain areas of eyewitness identification phenomena.[5] The People concede that there is little or no corroborating evidence in this case (transcript at 3). Given this, the People recognize that, pursuant to the recent Court of Appeals decision in People v LeGrand (8 NY3d 449 [2007]), certain areas of expert testimony regarding eyewitness identifications are admissible at trial. Thus, the People do not challenge the admissibility of such testimony regarding the relationship between witness confidence and accuracy of identifications, testimony regarding the effect of postevent information on accuracy and testimony regarding confidence malleability (People v LeGrand, supra at 458; People’s mem on eyewitness identification expert *934 testimony at 1). The People oppose the admissibility of the remaining phenomena identified by defendant and submit that these phenomena do not meet the standard for admissibility set forth in Frye v United States (293 F 1013 [DC Cir 1923]).
1. The Effect of the Court of Appeals LeGrand Decision
As an initial matter, the court notes that the LeGrand decision covers several phenomena for which the defendant here seeks expert testimony, and, thus, as it is conceded that this is a case with little or no corroborative evidence, such testimony is admissible here. Thus, the court will allow expert testimony regarding the phenomenon which demonstrates that there is a low correlation between a witness’ confidence and the accuracy of the witness’ identification (People v LeGrand, supra at 458). In addition to the phenomenon regarding the relationship of confidence to accuracy, the LeGrand decision also found as admissible the phenomenon regarding “the effect of postevent information on accuracy of identification” (id.). While neither the defendant’s submissions nor Dr. Penrod specifically referred to this particular phenomenon by name, it is clear that several of the phenomena for which the defendant seeks testimony falls within the ambit of postevent information. Specifically, these phenomena are increased exposure time, retention interval and mug shot induced bias.
While the Court of Appeals in LeGrand did not substantially discuss what constitutes “postevent information,” the underlying Supreme Court decision which it reversed described the phenomenon in detail. In that decision, postevent information was described as the “impact of various types of suggestion, such as that involved in lineup and photo array procedures and postidentification feedback suggesting the identification was correct, on the witness’s recollection of a perpetrator’s appearance” and that “witnesses exposed to this type of post-event information tend to incorporate it into their memory of the actual event.” (People v LeGrand, 196 Misc 2d 179, 193 [Sup Ct, NY County 2002].) While not using the specific nomenclature of “mug shot bias” or “retention interval,” a fair reading of the description of “postevent information” overlaps with these two other areas identified by the defendant in this case. Similarly, increased exposure time is a concept so interrelated with retention interval, in that they both relate to how human memory is formed and the impact that time can have on the formation of memory, that this concept can also be seen as an aspect of mug shot bias.
*935 Thus, the concepts of mug shot bias, retention interval and exposure duration substantially overlap in interpretations and explanations of postevent information affecting eyewitness identifications. Since the Court of Appeals in LeGrand recognized the admissibility of expert testimony regarding postevent information in cases with little or no corroborating evidence, this court will allow testimony on these phenomena, as well as the phenomenon regarding witness confidence, subject to the defendant’s laying of a proper foundation at trial and to the limitations regarding such testimony set forth below.
Having decided that the LeGrand case controls as to four of the eight eyewitness phenomena for which the defendant seeks expert testimony at trial, we now address the admissibility of testimony as to the remaining phenomena of stress, partial disguise, own-race bias and weapon focus.
2. The Frye Test
In New York, courts assessing the admissibility of expert testimony apply the four- prong test set forth in Frye v United States (supra; see People v Wesley, 83 NY2d 417 [1994]). Using the Frye test, the court must determine whether such proposed testimony is (1) relevant to the witness’ identification, (2) proffered by a qualified expert, (3) on a topic beyond the ken of the average juror, and (4) based on principles that are generally accepted as reliable by the scientific community. (People v Le-Grand, supra at 452.) Moreover, the admissibility and bounds of expert testimony are addressed primarily to the sound discretion of the trial court (People v Cronin, 60 NY2d 430, 432 [1983]). The court addresses each of the Frye factors in turn below.
A. Is the Proposed Testimony Relevant to the Witnesses’ Identifications?
As noted above, this case involves the identification of the defendant as the perpetrator of the shootings and robbery by four eyewitnesses. An additional witness to the shooting failed to identify the defendant as the perpetrator. The facts of the case involve a weapon which was seen by these witnesses, and, in three of the four cases, involve the perpetrator firing the weapon at the witness, an obviously stressful situation. The description of the perpetrator which was given to the police noted that he had cornrows and was wearing a “hoodie” and therefore that his head was at least partially obscured. All of the identifying witnesses were shown photographic arrays containing the defendant’s photo prior to identifying the defendant at a lineup, *936 and, in some cases, failed to identify the defendant from the photo arrays. At least three of the four identifying witnesses are Hispanic; the defendant is African-American, so cross-race issues are potentially implicated.
Given these facts, the expert testimony sought to be elicited by the defendant is relevant, since it goes directly to the heart of this case, i.e., the identity of the perpetrator of the shooting and robbery at the Cibao Deli, as well as the facts and circumstances surrounding the identifications (see People v Williams, supra).
B. Is the Proposed Testimony Proffered by a Qualified Expert?
The court finds Dr. Steven Penrod to be an expert qualified to
testify about psychological phenomena affecting eyewitness identification. At the Frye hearing, in addition to defendant’s proffering of his curriculum vitae, Dr. Penrod testified that he has a Bachelor’s degree from Yale College, a law degree from Harvard University, and a Ph.D. in psychology, also from Harvard. He testified that he held faculty positions at the University of Wisconsin in Madison, the University of Minnesota and the University of Nebraska before joining the faculty at John Jay, where he is among only two percent of his fellow faculty as a Distinguished Professor. Dr. Penrod testified that he has authored approximately 60 publications relating to eyewitness identification, with about 25 of those publications reporting peer reviewed research in peer reviewed scientific journals and the remaining publications being chapters in books or books relating to eyewitness identification. He is a member of the National Science Foundation Law and Social Sciences Program, from which he has received several research grants. He stated that his research primarily involves eyewitness identification issues and jury decision making issues.
While the People challenge several of the areas of eyewitness phenomena sought to be elicited by the defendant at trial, they do not challenge Dr. Penrod’s qualifications. Hearing testimony established that Dr. Penrod has impressive educational and professional credentials in this field, and, thus, the court finds him qualified to testify as an expert in this matter.
C. Is the Proposed Testimony Beyond the Ken of the Average Juror?
The court finds the proposed testimony to be beyond the ken of the average juror. While jurors may have familiarity through their own life experience with some of the factors relevant to *937 the reliability of eyewitness identifications, the issue here is whether the expert’s specialized knowledge can give the jurors more perspective than they can get from their own experiences (People v Young, 7 NY3d 40, 45 [2006]). As to proposed testimony regarding eyewitness identification phenomena, the Court of Appeals has stated that “it cannot be said that psychological studies regarding the accuracy of an identification are within the ken of the typical juror.” (People v Lee, 96 NY2d 157, 162 [2001], citing People v Cronin, 60 NY2d 430 [1983].) Therefore, the court finds that the testimony proposed here is beyond the ken of the average juror.
D. Is the Proposed Testimony Based on Principles That Are Generally Accepted as Reliable by the Scientific Community?
This prong of the Frye test requires the trial court to determine whether there is a general consensus among scientists within the relevant community that the proposed testimony is reliable (People v Smith, 2 Misc 3d 1007[A], 2004 NY Slip Op 50172[U] [2004]). This question involves considering whether a sufficient number of other experts in the same field accept the reliability of the research findings (Marsh v Smyth, 12 AD3d 307, 311 [1st Dept 2004]). It is a test which emphasizes “counting scientists’ votes rather than on verifying the soundness of a scientific conclusion.” (People v Wesley, 83 NY2d 417, 439 [1994].) As the party proffering such expert testimony, the burden is on the defendant to lay the proper foundation that the proposed testimony meets this test (People v Smith, supra).
A threshold consideration in applying this prong of the Frye test is defining the relevant scientific community. “If the field is too narrowly defined, the judgment of the scientific community will devolve into the opinion of a few experts. The field must still include scientists who would be expected to be familiar with the particular use of the evidence at issue, however, whether through actual or theoretical research.” (People v Wesley, supra at 438 [Kaye, Ch. J., concurring] [citations omitted].)
At the Frye hearing, the People argued that the relevant scientific community should be the membership of the American Psychological Association (APA), which they allege has 148,000 members, or, in the alternative, the membership of the American Psychology Law Society, which they allege has 2,613 members. Dr. Penrod disputed that either of these organizations are the appropriate relevant scientific community in this case. As to the APA, Dr. Penrod noted that the vast majority of psychologists are not researchers, but rather practice psychol *938 ogy in a therapeutic setting, and therefore could not be expected to have any significant familiarity with research regarding eyewitness identification phenomena. As to the Law Society, of which Dr. Penrod is a member and former president thereof, he noted that even within this subset of the psychological community, most members are not researchers, but rather psychologists who work within or in tandem with the court system in various clinical settings. In contrast, Dr. Penrod argued, and this court agrees, that the appropriate scientific community is psychologists who have conducted research in the field of eyewitness identification, which Dr. Penrod estimates is comprised of about 250 individuals world wide. These individuals can be expected to be “familiar with the particular use of the evidence at issue,” i.e., whether and/or how such eyewitness phenomena affect the accuracy of witness identifications (see People v Williams, supra at 588 n 45).
Addressing each of the remaining proposed areas of expert testimony, the court finds as follows:
i. Stress
In support of his conclusion that the relevant scientific community generally accepts as reliable the proposition that stress negatively affects eyewitness accuracy, Dr. Penrod testified at the Frye hearing as to a meta-analysis by Deffenbacher and Bornstein, as well as a study by Charles Morgan regarding the effects of stress on soldiers undergoing simulated prisoner of war interrogations. Dr. Penrod testified that the general conclusion of these studies is that
“the primary effect of stress is on hit rates, but the net effect is that of all identifications made by witnesses, the proportion of incorrect identifications goes up significantly. . . . [B]ecause you’ve got a mix of correct and incorrect identifications, as the number of correct identifications goes down, you get a higher proportion of incorrect identifications.” (Transcript at 15.)
In other words, while stress does not cause an increase in false identifications, it causes a decrease in the amount of correct identifications, which leads to a higher proportion of false identifications (transcript at 74).
On cross-examination, the People moved the Kassin survey into evidence and noted that, based upon that survey, only 4 of 64 respondents found the proposition that “very high levels of stress impair the accuracy of eyewitness testimony” to be very *939 reliable and only 19 of 64 found the proposition to be generally reliable. Thus, applying the Frye standard, the proposition regarding the effects of stress was found reliable by only 36% of the relevant scientific community. Moreover, the Kassin survey itself, in its introductory paragraph, notes that, by an agreement rate of at least 80% there was a strong consensus that several phenomena were sufficiently reliable to be presented in court; however, stress is not listed among these phenomena considered sufficiently reliable. In response, Dr. Penrod noted that the Kassin survey was published in 2001, which was before either the Deffenbacher meta-analysis or the Morgan study was published. Based upon his interaction and conversations with other researchers in the field, Dr. Penrod opined that, as a result of additional research since 2001, the results for reliability would be much higher if the survey was taken now.
Indeed, after the hearing on June 14, Dr. Penrod himself undertook an updated survey which was modeled on the Kassin survey, and the defendant moved this into evidence at the continuation of the hearing on June 28. This new survey found that 54% or 34 of 63 respondents, found the proposition regarding stress to be either generally or very reliable, an increase that Dr. Penrod noted was significant.[6] Additionally, since 41.5% of the respondents indicated that they had not read the Morgan article (because, Dr. Penrod submits, it was published in a psychiatric and not psychological journal), Dr. Penrod opined that if that article had been read, one could expect the percentage to be even stronger.
On cross-examination, the People elicited that the survey was created and distributed to respondents after the June 14 hearing, and that respondents only had 30 hours to submit the completed survey to be counted in the results. Dr. Penrod conceded that the survey was created after the hearing on June 14, and that in addition to using the survey in this case, he intended to eventually publish it. It was also elicited that the survey was sent to researchers known to Dr. Penrod, although *940 Dr. Penrod stated that he knows virtually all the researchers in this field. Moreover, the People noted that the first version of the survey, which was submitted in advance of the continuation of the hearing, had several errors in it which were corrected in the amended version submitted in court on June 28.
The court finds that the defendant has failed to meet his burden in demonstrating that the proposition that high levels of stress negatively affect identification accuracy and eyewitness recall has been found to be reliable by a general consensus of the relevant scientific community. It is difficult to precisely define when a scientific principle crosses the line from the experimental to the demonstrative stage; the Frye decision itself refers to this area as “the twilight zone” (Frye v United States, supra at 1014; People v Williams, supra). The proposition that high levels of stress negatively affect eyewitness identifications is one of these “twilight zone” areas. Indeed, even Dr. Penrod himself admitted that, in the universe of eyewitness identification phenomena, “agreement is not as high with respect to stress as it has [been] with respect to some other factors” (transcript at 23).
Given the information presented to the court at the hearing, it cannot be said that defendant has demonstrated a general consensus as to reliability of the particular phenomenon of stress as it relates to eyewitness identifications. It is noted that although the Deffenbacher meta-analysis and the Morgan study were considered to be very important by Dr. Penrod for the increase in the acceptance within the scientific community, the defendant did not move these studies into evidence at the hearing so that the court could review them. The Kassin survey demonstrates that, as of 2001, there was little consensus within the scientific community that this particular phenomenon was reliable, as only about a third of respondents found it so. While defendant submits that Dr. Penrod’s new survey shows a significantly increased rate of acceptance of reliability, little more than half, or 34 of the respondents, accepted the proposition as reliable. Moreover, the People’s criticisms of this new survey are well taken. It was admittedly created for this specific litigation, with respondents having only 30 hours to submit their answers. While Dr. Penrod states that he intends to eventually publish the survey, it has not yet been published or subjected to the peer review process. This is significant as the first draft contained errors which were corrected in an amended survey, but there may be other errors that are not readily *941 evident to persons who are not psychologists or statisticians. It would be expected that the peer review process would expose and lead to a correction of any such errors. For these reasons, the court finds that the defendant has not met his burden establishing that the proposition that high levels of stress negatively affect identification accuracy and eyewitness recall has been found to be generally accepted by the relevant scientific community. Defendant’s motion to admit the proffered expert testimony as to the phenomenon of stress is denied.
ii. Partial Disguise
In support of his conclusion that the relevant scientific community generally accepts as reliable the proposition that a partial disguise worn by a perpetrator diminishes recognition of the perpetrator by the witness, Dr. Penrod testified at the Frye hearing as to two studies — one conducted by himself and Peter Shapiro in 1986, and another which he conducted with an unnamed graduate student while at the University of Wisconsin. In the study conducted with Shapiro, the appearance of individuals were manipulated by having them take off items such as mustaches, beards and hats and having subjects attempt identifications. Dr. Penrod testified that the results of that study were that if appearances of the perpetrator were changed, correct identification rates go down and “you get more false alarms with a change of appearance.” (Transcript at 49.) As to the study done in Wisconsin, Dr. Penrod stated that subjects were shown one of two versions of a videotape of a robbery, one with the perpetrator wearing a knit hat which sat above the ears and covered the hairline and one where the perpetrator was not wearing any hat. Dr. Penrod’s recollection of the results of this experiment was that, when the perpetrator wore the hat, the “hit rates dropped from like 47 percent to 25 percent.” (Transcript at 50.) Dr. Penrod opined that the obscuring of the hairline by the hat was responsible for this result, as this is “probably the most important cue . . . that people use to differentiate people from one another.” (Id.)
The court finds that defendant has not met his burden in proving that the relevant scientific community generally accepts as reliable the proposition that a partial disguise worn by a perpetrator diminishes recognition of the perpetrator by the witness. There were only two studies cited by Dr. Penrod in support of his position that this phenomenon regarding disguise has been accepted as generally reliable. Neither of these studies were provided to the court, nor were their full titles given. As to *942 the Wisconsin study, Dr. Penrod did not even state when this study was conducted. He also did not indicate whether these studies were published and subjected to peer review. Moreover, unlike the other phenomena at issue in this case, this phenomenon was not included in the Kassin survey, or even in Dr. Pen-rod’s updated survey, so other than Dr. Penrod’s testimony, there is no independent measurement of the general acceptance in the relevant scientific community for this proposition. For these reasons, defendant’s motion to admit the proffered expert testimony as to the phenomenon of partial disguise is denied.
iii. Cross-race Bias
In support of his conclusion that the relevant scientific community generally accepts as reliable the proposition that there is a cross-race bias which impairs the ability of witnesses of one race to make correct identifications of perpetrators of a different race, Dr. Penrod testified at the Frye hearing as to a meta-analysis done by Meissner and Brigham in 2001. This meta-analysis covered about 100 studies and about 5,000 research participants. Dr. Penrod testified that the findings of this meta-analysis demonstrated a 56% increase in false identifications when making other race identifications as opposed to same race identifications, and a 40% improvement in correct identifications for same race as opposed to other race identifications (transcript at 46). Dr. Penrod stated that “[a]t the end of the day they were saying you were 2.2 times more likely to make a correct identification, find the perpetrator, avoid mis-identifying somebody else. You’re 2.2 times more likely to be correct in a same race as opposed to other race situation.” (Transcript at 47.) When asked if this phenomenon occurred across all racial groups, Dr. Penrod replied that “the largest number of studies by far are with black and white” (id.), but that he did recall a study done in El Paso, Texas, involving non-Hispanic Caucasians and Hispanics. Dr. Penrod did not mention any studies demonstrating such a bias between Hispanics and African-Americans.
The court finds that defendant has not met his burden in proving that the relevant scientific community accepts as reliable the proposition on cross-race bias as it relates to Hispanic witnesses. While there is a growing trend in the scientific research which suggests that a witness may have an own-race bias which impairs the accuracy of cross-racial identifications, scientists disagree as to which racial groups it applies (see People v Carrieri, 4 Misc 3d 307, 308 [Sup Ct, Queens County 2004], citing State v Cromedy, 158 NJ 112, 120, 727 A2d 457, 461 *943 [1999]). Here, the expert concedes that most of the research deals with black/white racial identifications, and the one study he could recall with Hispanics (which, again, was not provided to the court), involved Hispanics and Caucasians. With the exception of Shands, who is African-American and to whom this phenomenon would not apply in any event, the witnesses here are Hispanic; the defendant is African-American. No evidence was adduced at the hearing in support of the cross-race bias occurring between these two groups. For this reason, defendant’s motion to admit the proffered expert testimony as to the phenomenon of cross-race bias is denied.
iv. Weapon Focus
The court finds that the defendant has demonstrated that the relevant scientific community generally accepts as reliable the proposition that the phenomenon of “weapon focus” impairs the ability of a witness to make a subsequent identification of the perpetrator. At the hearing, Dr. Penrod pointed to the results of the Kassin survey, which found that 66% of respondents found the phenomenon to be very reliable or generally reliable, and to his own survey which found that 65% of respondents found the proposition to be either reliable or generally reliable. He also referred to a meta-analysis by Nancy Steblay and a more recent study by Kerri Pickel that supported these findings.
When questioned about the lower court opinion in LeGrand, which found that the phenomenon of weapon focus had not been generally accepted as reliable by the relevant scientific community, and which part of that decision had been upheld by the Court of Appeals, Dr. Penrod offered explanations as to why the lower court’s analysis and rejection of the research in support of this proposition was flawed. He testified that the lower court’s conclusion that the meta-analysis did not adequately represent the majority of studies on weapon focus (see People v LeGrand, supra, 196 Misc 3d at 198) was incorrect from a statistical point of view, as it involved merely counting the studies and comparing their results, which ignores the way meta-analysis weighs different factors to account for variables and ignores the way statistical significance is determined. Dr. Pen-rod further testified that, as a matter of statistics, in order to negate the conclusion of the meta-analysis that there is a relationship between weapon focus and the accuracy of witness’ identifications, “a couple of hundred studies, each of which show no relationship” between the two factors would be required. (Transcript at 103.) Dr. Penrod’s explanation of why *944 the lower court in LeGrand was incorrect in this regard closely mirrored the reasoning given by Dr. Elizabeth Kovera in People v Williams (supra) which granted the defendant’s motion in that case to offer testimony on the phenomenon of weapon focus. Dr. Penrod further criticized the lower court’s LeGrand decision for noting that the research was a “work in progress,” as virtually all scientific research is a work in progress and that the existing research demonstrated that there is a “reliable conclusion that [can be offered] on the effects of weapons focus.” (Transcript at 107.) Lastly, Dr. Penrod took issue with the lower court for noting that only 77% of the respondents to the Kassin survey would testify in court about weapon focus, as there are many reasons for not wanting to testify in court, including that some researchers simply prefer to focus on their research as opposed to holding themselves out as expert witnesses, or being nervous about testifying in open court and subjecting themselves to cross-examination.
For the above reasons, this court grants defendant’s motion for expert testimony as to the phenomenon of “weapon focus” and its effect on the accuracy of eyewitness identifications.
Conclusion
The defendant’s expert, Dr. Steven Penrod, may testify at trial in this matter regarding the psychological phenomena of the low correlation between the confidence of a witness and the accuracy of that witness’ identification, mug shot bias and the related phenomena of increased exposure time and retention interval, and weapon focus. The expert may not testify as to the phenomena of stress, partial disguise or cross-race bias. Furthermore, the expert may not testify as to his opinion regarding the accuracy of any identification by any witness in this case. Additionally, the expert may not offer an opinion as to whether any of the psychological phenomena outlined above actually influenced any of the identifications (or nonidentifications) in this case. In sum, the expert is limited to setting forth the relevant psychological factors and interpreting the research data that demonstrate an effect on memory and perception (see People v Drake, 7 NY3d 28, 31 [2006]; see generally People v Taylor, 75 NY2d 277, 293 [1990]; People v Brooks, 128 Misc 2d 608, 617 [Westchester County Ct 1985]).

. “Increased exposure time” refers to the phenomenon that the longer a person is exposed to a face, the more likely that person will make a correct identification at a later time (People v Williams, 14 Misc 3d 571 [Sup Ct, Kings County 2006]).

. The “retention interval” was defined at the Frye hearing by defendant’s expert as the time between the initial viewing of the perpetrator by the witness and the witness’ subsequent identification of someone as the perpetrator (see transcript of June 14 Frye hearing at 34).

. “Mug shot induced bias” occurs when a witness sees a mug shot or photo array containing a suspect and then is more likely to identify the suspect later in a lineup, regardless of whether or not the suspect is the actual perpetrator (see People v Williams, supra).

. “Weapon focus” is the phenomenon which occurs when, during the course of a crime, a witness is exposed to a weapon, and the witness focuses his or her attention on the weapon and not on the perpetrator’s face, which impairs the ability of the witness to make a subsequent identification of the perpetrator (see People v Williams, supra).

. The People also argue that the defendant’s June 11, 2007 offer of proof did not mention the specific phenomena of weapon focus or mug shot bias, and therefore testimony on these topics should not be allowed. However, this argument does not take into consideration defendant’s further offer of proof letter dated June 13, 2007. While this letter fails to explicitly cite the phenomena of “weapon focus” or “mug shot bias” by those names, it clearly refers to the presence of a weapon while the various witnesses viewed the perpetrator, and notes that all of the identification witnesses were shown photo arrays containing the defendant’s picture prior to identifying the defendant at a lineup. Moreover, as noted infra, many of these psychological phenomena are interrelated, so narrowly construing the offer of proof to cover only some aspects of a larger phenomenon does not provide a complete picture of how the phenomenon works. Thus, the court accepts defendant’s offer of proof as covering weapon focus and mug shot bias as well as the six phenomena referred to in defendant’s June 11 letter.

. In table 5b of the Penrod survey, stress is listed as having been found as generally reliable by 79% of the respondents. However, it is noted that the percentages represent the number of respondents who rated that phenomenon as either “tends to favor,” “generally reliable” or “very reliable.” However, the Frye standard relates to whether the relevant scientific community finds the proposition at issue to be generally accepted by the scientific community, not whether the research “tends to favor” the proposition. Thus, excluding those who found that the research “tends to favor” the proposition, as opposed to those who found it rehable, the correct percentage is 54%.